IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALFONSO FREEMAN,                    )
                    Plaintiff,      )
                                    )
    vs                              )        Civil Action No. 15-1102
                                    )
MEGAN J. BRENNAN, UNITED STATES     )        Magistrate Judge Mitchell
POSTMASTER GENERAL,                 )
                    Defendant.      )

MEMORANDUM OPINION AND ORDER

Plaintiff, Alfonso Freeman, brings this action against Defendant, Megan J. Brennan,

United States Postmaster General, alleging a claim of racial discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), and a hybrid claim under

39 U.S.C. § 1208(b) arising out of his termination, effective June 22, 2014, from his position as a

Motor Vehicle Operator with the United States Postal Service (Postal Service). Plaintiff

contends that the Postal Service discriminated against him on the basis of his race (African

American) and that it breached the Collective Bargaining Agreement by relying upon an accident

for which he received only counseling in terminating his employment while his Union breached

its duty of fair representation by withdrawing his grievance.

Currently pending before the Court is a motion for summary judgment, filed by

Defendant. Plaintiff has filed a brief in opposition and Defendant has filed a reply brief. For the

reasons that follow, the motion will be granted with respect to Count II of the Amended

Complaint and denied with respect to Count I.

Facts

Plaintiff worked at the Postal Service's General Mail Facility as a Postal Support

Employee (PSE) Motor Vehicle Operator (MVO) from January 19, 2013 to June 22, 2014.

(Freeman Dep. 88:2-7[1]; Def.'s App. Ex. B at 1-2; Ex. K; Traficanti Decl. ¶ 3[2]).  Plaintiff was

hired by Anthony Battle, Transportation Manager. (Battle Dep. 109:9-10.)[3]  As a PSE, Plaintiff

was a non-career, bargaining unit employee whose rights under the Collective Bargaining

Agreement (CBA) between the Pittsburgh Metro Area American Postal Workers Union (Union)

and the Postal Service were limited.  Defendant states that, for example, Plaintiff did not have a

regular schedule, work hour guarantees, or rights to the full range of progressive discipline. (ECF

No. 42 Ex. C at 35, 38; Jones Dep. 13:8-14, 14:25, 15:1-13, 45:1-8; 46:15-19, 47:11-18, 66:12-

17, 80:1-12;[4] Dziubinski Dep. 48:17-20;[5] Traficanti Decl. ¶¶ 1, 4.)  However, the Memorandum

of Understanding between the Union and the Postal Service actually states that:

> The full range of progressive discipline is not always required for PSEs; however,
> the parties agree that an appropriate element of just cause is that discipline be
> corrective in nature, rather than punitive.

(ECF No. 42 Ex. D.)  See also Jones Dep. 15:10-11 ("the memorandum says that they are not

always entitled to full range.")

During the relevant time, Plaintiff held a Class B Commercial Driver's License.

(Freeman Dep. 15:21-16:25.)  During his employment with the Postal Service, Plaintiff received

approximately 15.5 hours of driver training. (ECF No. 42 Ex. J at 1, 2-5; Fox Decl. ¶ 5[6].)

Plaintiff received training specific to defensive driving, including but not limited to, the

Defensive Driver Course for Postal Delivery Vehicle Operators, Course No. 4360106. (ECF No.

42 Ex. J at 1-5; Ex. M at 4, 18-19, 22, 28.)  He was required to follow safe driving practices and

to comply with all state and local traffic laws and Postal Service driving policies.  (ECF No. 42

---

[1] Def.'s App. (ECF No. 42) Ex. A.
[2] ECF No. 42 Ex. L.
[3] ECF No. 42 Ex. I.
[4] ECF No. 42 Ex. E.
[5] ECF No. 42 Ex. G.
[6] ECF No. 42 Ex. EE.

Ex. C at 166; Traficanti Decl. ¶ 5; Fox Decl. ¶¶ 6-10; Ex. J at 1; Ex. M at 8; Ex. N at 40; Ex. O at 1-3.)

During the relevant time, Plaintiff had three supervisors. Dorothy Bradshaw was a Tour 1 (night) Supervisor, Transportation Operations, and supervised Plaintiff when he worked on that shift. (Bradshaw Dep. 8:17-24[7]; Battle Dep. 38:11-13.) Glenn Ramsey was a Tour 2 (day) Supervisor, Transportation Operations, and supervised Plaintiff when he worked on that shift. (Battle Dep. 38:11-13.) Tom Dziubinski was a Tour 3 (afternoon) Supervisor, Transportation Operations, and supervised Plaintiff when he worked on that shift. (Ramsey Dep. 11:12-14[8]; Dziubinski Dep. 11:5-7; Battle Dep. 38:11-13.)

Duties of a Supervisor, Transportation Operations, include oversight of drivers who operate Postal Service commercial vehicles for purposes of transporting bulk mail from one postal facility to another, as well as picking up mail from customers' facilities. (Bradshaw Dep. 11:1-12:12.) Duties of a Supervisor, Transportation Operations, also include deciding Step 1 grievances. (Battle Dep. 23:15-24.)

During the relevant time, Anthony Battle, Transportation Manager (formerly called the Postal Vehicle Service (PVS) Manager), supervised Bradshaw, Ramsey and Dziubinski. (Battle Dep. 5:17-20, 24:3-11, 37:23-38:7.) Duties of the Transportation Manager include deciding grievance appeals at Step 2. (Battle Dep. 23:25-24:14.)

The Postal Service defines a Motor Vehicle Accident as follows:

Motor Vehicle Accident. Any accident involving a motor vehicle that:
• Is operated for official Postal Service business (no matter who owns the vehicle); and
• Results in death, injury, or property damage of 1 dollar or more (unless the vehicle is properly and legally parked).

---

[7] ECF No. 42 Ex. F.
[8] ECF No. 42 Ex. H.

The following factors are *not* considered in determining if a motor vehicle accident has

occurred:

- Who was injured.
- What property was damaged (and to what extent).
- Where the accident occurred.
- Who was responsible.

(ECF No. 42 Ex. M at 3.)

Plaintiff had three motor vehicle accidents during his employment with the Postal

Service. (Freeman Dep. 41:18-20, 42:4-23; Dziubinski Dep. 52:20-53:5; ECF No. 42 Ex. T.)

Plaintiff testified as follows:

Q: Let me ask you as a general matter, did you take seriously the incidents that
occurred, one, two and three?
A: Yes.
Q: Did you understand that they potentially could have resulted in some sort of
disciplinary action, each one?
A: Yes.

(Freeman Dep. 87:19-88:1.)

Plaintiff testified further as follows:

Q: And do you think or have you considered that the three incidents had
undermined the confidence that your supervisors had in you as a driver?
A: I understand that part, yes.

(Freeman Dep. 142:18-21.) However, he testified that this was never expressed to him.

(Freeman Dep. 142:22-143:5.)[9]

<u>March 30, 2013 Accident</u>

The first accident occurred on March 30, 2013, when Plaintiff backed up into and bent a

fence pole at the Blawnox Postal facility while operating an 11-ton truck. (ECF No. 42 Ex. P at

BATTLE 105, 108, 125, 129; Freeman Dep. 42:13-17; Ex. T.) Plaintiff contends that the

---

[9] Pl.'s App. (ECF No. 48) Ex. 1.

driver's side edge of the rear liftgate snagged on the fence post as he was navigating in reverse around the corner, that it was a very tight space, that others had previously hit the fence pole, and that, as Ramsey admitted, the lot was poorly lit. (Freeman Dep. 55:10-18; ECF No. 48 Ex. 2 at UNION 41; Ramsey Dep. 17:20-25, 18:9-12; Washington Dep. 14:23-15:6.[10])

Plaintiff's supervisor at the time was Tom Dziubinski, who investigated the accident. (ECF No. 42 Ex. P at BATTLE 106-07). During the Pre-Disciplinary Interview (PDI), Plaintiff admitted that, through orientation and being reminded of it every day, he was aware of the Postal Service's policy requiring that he work safely at all times. (Id. at BATTLE 109).

No discipline was requested or imposed. (Id. at BATTLE 106.) Plaintiff received additional driver training. (ECF No. 42 Ex. J at 1; Ex. P at BATTLE 112 (box 64)). Additional training is not discipline under the CBA. (Jones Dep. 54:10-14.)

March 13, 2014 Accident

The second accident occurred on March 13, 2014, while Plaintiff was operating a 7-ton truck. (ECF No. 42 Ex. Q at BATTLE 83 (box 68); Ex. T). Plaintiff and a privately operated vehicle (POV) collided when the POV made a right turn from the left lane as Plaintiff, while in the right lane (in the same direction), who had stopped his vehicle and was speaking to a pedestrian, then proceeded straight into the intersection of Allegheny and Western Avenues. (Id. at BATTLE 69-72, 86, 89, 96; Freeman Dep. 42:18-20.) Plaintiff notes that some of the records regarding this incident say that he struck the other vehicle, others that it struck him; some indicate that he checked his clearances before proceeding; and some say the POV driver admitted that he made an illegal turn (turning right from the left lane) and that he "figured" that Plaintiff's vehicle was parked, which was incorrect. (ECF No. 42 Ex. Q at BATTLE 69-72, 96.)

---

[10] ECF No. 48 Ex. 4.

Plaintiff's supervisor at the time was Glenn Ramsey, who investigated the accident. (Ramsey Dep. 23:7-9; ECF No. 42 Ex. Q at BATTLE 83 (box 89), 84-86, 91.) Ramsey determined that Plaintiff was at fault for the accident. (Ramsey Dep. 25:16-18; ECF No. 42 Ex. Q at BATTLE 75-76.) Plaintiff disputes that he was at fault and notes that he refused to sign the letter presented to him that claimed he was at fault. (Ex. Q at BATTLE 69; Freeman Aff. ¶ 4.[11]) He also testified that, when Ramsey arrived at the scene of the accident, he "looks at me and says 'Hey, man. This is not your fault. Continue onto your run.'" (Freeman Dep. 48:21-22.)[12]

Ramsey requested a 7-day suspension as discipline. (Ex. Q at BATTLE 69, 76.) Battle decided not to impose a 7-day suspension, but concurred with the request to impose discipline at a lower level with a Letter of Warning (LOW) instead. (ECF No. 42 Ex. Q. at BATTLE 76; Battle Dep. 53:6-17.) The LOW states that "future deficiencies will result in more severe disciplinary action being taken against you. Such action may include suspensions, reduction in grade and/or pay, or removal from the Postal Service." The LOW states further that "you were responsible for an accident that could have been prevented." (Id. at BATTLE 69.) Plaintiff refused to sign the LOW. (Ramsey Dep. 37:1-9.)

Ramsey agreed to further reduce Plaintiff's discipline to a one-year LOW at Step 1 of the grievance process. (ECF No. 42 Ex. U at WJ 70; Ramsey Dep. 37:15-38:4.) He testified as follows:

> Q: Okay. Now, were you the one who ascribed fault for that accident to Mr. Freeman?
> A: Yes.
> Q: And just so the record's clear, why did you ascribe fault to Mr. Freeman for that incident that took place on March 13, 2014 at the intersection of Western

---

[11] ECF No. 48 Ex. 8.

[12] Plaintiff also points to testimony by Alvin Washington, another PSE, that he assumed that Plaintiff was not at fault for the second accident because he was allowed to continue his run that day. (Washington Dep. 14:10-22.) (ECF No. 48 Ex. 4.)

Avenue and Allegheny Avenue?
A: Because I felt he could have avoided it if he would have paid attention.
Q: Before you made your determination on that, did you speak with Mr. Battle?
A: No. When it's a letter of warning, I don't have to speak. I can make that
determine -- for a letter of warning, I can determine that on my own.

(Ramsey Dep. 38:5-21.) Ramsey was asked about the fact that the driver of the POV had made

an illegal turn, and he responded: "I still think he [Freeman] could have avoided hitting it."

(Ramsey Dep. 52:14-15.)

In a meeting with Battle following the accident, Plaintiff was reminded of the importance

of safety, and advised that if he had another accident, he could be terminated. (Freeman Dep.

62:2-12; Ex. Q at BATTLE 74). Plaintiff received additional driver training, including defensive

driving. (ECF No. 42 Ex. J at 1, 3.)

William Weisser, a Union Steward and Postal Service driver, testified as follows:

Q: So when a vehicle makes an illegal turn in front of a driver, would you, as a
truck driver yourself, ascribe fault for an accident to the truck driver?
***
A: Without being in the seat, I couldn't tell you. But I know it happens on a
regular basis. You have to be aware of your surroundings.
Q: Would that truck driver be aware of their surroundings if they checked the left
mirror, checked the right mirror, and then checked the left mirror again before
proceeding?
A: Once again, if I wasn't in the seat, I can't tell you.
Q: But if you were in the seat and you checked the left mirror and you checked
the right mirror and then you checked the left mirror again –
A: You still have to check in front of you.
Q: All right.
A: I've been driving 30 years.

(Weisser Dep. 6:9-15, 22:18-21, 24-25, 23:1-15.)[13]

May 13, 2014 Accident and Removal

The third accident occurred on May 13, 2014, while Plaintiff was operating an 11-ton

truck. (ECF No. 42 Ex. R at BATTLE 55 (box 69); Freeman Dep. 42:21-23). While traveling

---

[13] ECF No. 42 Ex. AA.

inbound in heavy, bumper-to-bumper traffic on the Parkway East, Plaintiff struck the rear of a POV when he took his eyes off the road to look down at his schedule. At his deposition, Plaintiff testified that there was "something wrong with the brakes" and that he told the Postal Service about it at the time. (Ex. R at BATTLE 26-27, 31-32, 50, 54, 58-59, 65; Freeman Dep. 64:3-12, 24-25, 65:1.)[14]

Plaintiff notes that an earlier version of this accident report states that he:

had foot on brake pedal and thought that vehicle was stopped. Next thing he knew he struck the vehicle (a SUV) in front of him in the rear.

(ECF No. 48 Ex. 7 at BATTLE 39.)[15] However, even this statement is ambiguous—it does not make clear whether Plaintiff's foot was on the brake pedal when the vehicle drifted forward. More importantly, nowhere in the investigation, including the handwritten statement that he submitted at the time, is there any reference to a problem with the brakes. (ECF No. 42 Ex. R at BATTLE 31-34, 53-58.) Rather, his handwritten statement, created on the same day the accident occurred, described what happened as follows:

I was inbound on Parkway East traffic was heavy I was stopped behind a SUV so I took the time out to take a quick look at the schedule[;] it was a route I was not familiar with the times on the schedule were inked over and very hard to make out as I was trying to make out what the [sic] I was due back to the PDC the truck drifted into the back of the SUV that was in front of me.

(Ex. R at BATTLE 58; Freeman Dep. 95:4-14, 96:12-14.)

--------

[14] The accident report contains the statement "Had foot on the brake and was looking at his schedule. Not paying attention and drifted into the rear of the vehicle in front of him." (Ex. R at BATTLE 54, ¶ 36.) However, this statement is ambiguous and there is nothing in the record to support the meaning that the vehicle drifted forward even though he had his foot on the brake. It would appear that the statement "not paying attention" meant that he allowed his foot to slip off of the brake and that is why the vehicle drifted forward.

[15] Plaintiff also contends that the reports improperly relied on "hearsay" from the POV's unsigned and unnotarized statement. (ECF No. 47 ¶ 46.) However, the reports were prepared by the Postal Service as an employer, not for the purpose of being submitted to a court, and thus the hearsay argument is inappropriate.

He also argues that Charles McCloskey, whose accidents are discussed below, reported a faulty braking system and his "advisement was not met with disregard." (ECF No. 50 at 8.) However, the record he cites contains no evidence that McCloskey reported a faulty braking system, much less that it was investigated. See ECF No. 48 Ex. 29 at 113.

Plaintiff also argues that, had the Postal Service not added a sudden, additional stop to his schedule, he would not have been required to refer to his schedule while stopped in bumper-to-bumper traffic and that, had the air brakes worked properly, his truck would not have "drifted" into the bumper of the vehicle in front of him. (Freeman Dep. 63:1-65:25.) Plaintiff has not explained how being given an additional stop on his schedule relieved him of the responsibility to drive safely and as just noted, there is no reference to the brakes being faulty in his handwritten statement, the accident report or anywhere in the investigation at the time.[16]

Plaintiff's supervisor at the time was Tom Dziubinski, who investigated the accident. (Ex. R at BATTLE 28, 31, 51; Dziubinski Dep. 35:10-11.) During the PDI, Plaintiff admitted that he "was trying to take a quick look at the schedule" and that he could have prevented the accident "[b]y not looking at his schedule." (Ex. R at BATTLE 32; Freeman Dep. 85:14-86:14.)[17] During the PDI, Plaintiff also admitted that he realized the seriousness of his actions, that he had two accidents, and how that record could reflect on his driving skills. (Ex. R at BATTLE 33; Freeman Dep. 86:17-25, 87:15-22.)

On May 15, 2014, Dziubinski requested that Plaintiff be removed from the Postal Service, and noted that Plaintiff's prior discipline included an LOW. (Ex. R at BATTLE 28;

---

[16] The only other reference in the record regarding the brakes is Plaintiff's Confidential Witness Affidavit, dated September 15, 2015, during his NLRB proceeding, in which he stated that "I contend that the vehicle[']s brakes were not functioning properly because the air brake slack adjuster were [sic] not properly adjusted." (ECF No. 42 Ex. BB at 3 ¶ 4.)

[17] Again, no reference was made to the brakes not functioning properly.

Dziubinski Dep. 44:19-24).  On May 16, 2014, Battle concurred in Dziubinski's request for removal. (Ex. R. at BATTLE 28.)  Plaintiff was issued a Notice of Removal, effective June 22, 2014, signed by Dziubinski and dated May 20, 2014, charging him with unsatisfactory performance and failing to perform his duties in a safe manner. (ECF No. 42 Ex. S at 1-2.) Dorothy Bradshaw, who had no decision-making role in the removal, presented the Notice of Removal to Plaintiff on May 22, 2014, in Dziubinski's absence. (ECF No. 42 Ex. S at 2; Bradshaw Dep. 21:17-22:12; Dziubinski Dep. 48:7-16.)

> Plaintiff testified as follows:
>
> Q: You signed the notice of removal. Was there anything in the notice of removal that you disagreed with?
> A: No. They wanted me to go. I'll go.
> Q: Explain your answer.
> A: Explain my answer. Okay. I'll explain it to you like this. They did not want me there. There was nothing I could do about it.
> Q: What made you think they did not want you there?
> A: Because of my attitude.
> Q: What makes you think that?
> A: Because, like I said, I'm a highly motivated person. And I'm not going to let you destroy that in me.

(Freeman Dep. 101:1-16.)[18]  Plaintiff testified further as follows:

> Q: Sir, is it your belief that you should have been retained on the job at the postal service following the three incidents?
> A: Yes.
> Q: Why?
> A: Why, for the fact of the matter, one incident was just made my fault. The other incident was a mechanical failure. And the first incident where they say I bent the pole, everybody claimed the pole was already bent. I snagged the fence.

(Id. at 137:12-21.)  Plaintiff notes that the record contains no evidence that there was a claim for

---

[18] Plaintiff contends that he also testified that he did not agree with the statement that he admitted he struck a POV or that he had two prior accidents.  (ECF No. 47 ¶ 55.)  However, the pages of his deposition in which he allegedly makes these statements (Freeman Dep. 159-60) are not in the record.

damages made. (Dziubinski Dep. 32:1-5.)[19] However, he points to no support for his implied

argument that he could be subjected to discipline only if there was vehicle damage. To the

contrary, as noted above, whether property damage occurs is irrelevant in determining if a motor

vehicle accident has occurred. (ECF No. 42 Ex. M at 3.)

Plaintiff's Union Grievance

The Union filed a Step 1 grievance challenging Plaintiff's removal on the basis that, inter

alia, the discipline lacked just cause and was punitive in nature and not corrective. (ECF No. 42

Ex. U at WJ 14-15, 19; Jones Dep. 18:11-13.) Following a Step 1 meeting, the Postal Service

denied the grievance on June 5, 2014, stating in a Grievance Summary – Step 1:

> The employee has had three accidents in the last 14 months. He has been given
> the driver refresher course twice in the same time frame and he still is having at-
> fault accidents. The last two he struck the other vehicle with the front of his
> vehicle. We hadn't even closed the last accident when he had the most recent. We
> as a company in dire financial shape cannot tolerate these kind of actions by [our]
> employees.

(Ex. U at WJ 19-20 (box 12, Reason for Decision).)

The Postal Service stated further in the Grievance Summary – Step 1:

> This employee has had numerous accidents in his time with the Postal Service.
> There have been 3 in the last 14 months of which 2 were in the last month. We are
> a company having financial hardships and we cannot continue to exist running
> with part time employees who cost us additional funds to correct their errors.
> When does it stop? When someone is severely injured or worse? We have tried to
> guide this employee with not one but two refresher classes and he is still not
> attentive to his surroundings and/or aware of what he is doing by his own
> admission in his statement during the accident investigation. Therefore in the best
> interest of the Postal Service we have no other choice than to release this
> employee from our company.

(Id. (box 19, Management's Position)).

On June 13, 2014, the Union pursued Plaintiff's grievance to Step 2. (Id. at WJ 13; Jones

---

[19] ECF No. 48 Ex. 6.

Dep. 18:17-22, 21:16-24.) On July 22, 2014, the Postal Service denied the Step 2 grievance in a

letter, which states, in part:

> Mr. Freeman was terminated for his inability to perform the required duties of his
> position. Specifically, Mr. Freeman failed to operate his vehicle in a safe manner.
> He had his third at fault accident on May 13, 2014 since his initial hiring date[,]
> January 2013. On this date Mr. Freeman rear ended a POV while driving on the
> Parkway East, causing damage to the POV driver['s] vehicle. Mr. Freeman had
> another at fault motor vehicle accident on March 13, 2014 (his second since he
> was hired at the time). In this instance Mr. Freeman struck a POV at the
> intersection of Western and Allegheny Avenues, carelessly failing to yield or
> check his clearance as he is required to do. His first accident occurred on March
> 13, 2013. He struck a fixed object (a pole) on this occasion while attempting to
> into the Blawnox Station parking lot approaching their dock/hydraulic lift. Mr.
> Freeman has received ample training to prepare him to complete his driving
> duties. He was given four hours of driver Improvement retraining on 3/17/2014 &
> one hour of defensive driving retraining on 4/5/2014 in an attempt to assist him in
> his duties. This was in addition to his initial driver training, which is given to all
> newly hired employees. In light of this it is my conclusion that Mr. Freeman is
> incapable of performing the normal duties (driving safely) the USPS requires of
> him as a Motor Vehicle Operator. Based on the above, I find no violation of the
> National Agreement. Therefore this grievance is denied.

(ECF No. 42 Ex. U at WJ 9; Jones Dep. 25:7-19.) On or about July 26, 2014, the Union

amended the grievance to request pay in lieu of work that Plaintiff was entitled to but did not

receive. (Ex. U at WJ 7-8.)

The Union appealed the decision to arbitration. (ECF No. 42 Ex. U at WJ 4-6, 24; Jones

Dep. 26:23-25.) William Jones, Vice President and Business Manager for the Union (Jones Dep.

6:20-21), testified:

> Q: As of February 9th, 2015, there was every intention to proceed to arbitration; is
> that correct?
> A: Yes.

(Jones Dep. 30:18-20). He explained as follows:

> A: I appealed it to arbitration based mainly on that they were not compensating
> him for the 30 days, that he was entitled to be paid after the effective date of
> removal. I also at that time didn't believe that we could reasonably expect to
> prevail in arbitration.

Q: You did?
A: On the removal part. I did not.
Q: You did not. Why did you not, sir?
A: Postal Service, with motor vehicle operators, even career, pretty much especially with Mr. Battle was the manager, disciplines every driver, that gets -- has an accident, and so, being it's pretty tough to -- for career employees that have a number of accidents, for a noncareer employee, I didn't believe the arbitrator would side with the union and the grievant.
Q: Had you formulated any opinion about the number of accidents that Mr. Freeman had had?
\*\*\*
A: Well, that accident prior I think was less than a month and a half, two months prior, which is pretty -- pretty quick. And, as I said, this refreshed my memory, I said I thought he had a third accident, first one prior to that, but he had had -- it's a little hot – that's -- career employees don't have those kinds of accident records, and I don't know of too many – don't know of any PSE's that have that kind of accident record.

(Jones Dep. 28:10-29:11) (objection omitted.) Plaintiff cites another section of Jones' deposition in which Jones was asked if he had discussions with the Postal Service about bringing Plaintiff back to work and he said "At the beginning, I try to get everything I can." (Jones Dep. 42:20.)

An arbitration hearing, which was scheduled for February 26, 2015, did not occur. (ECF No. 42 Ex. U at WJ 4; Jones Dep. 39:3-4.) On March 25, 2015, William Jones for the Union, and Daniel Traficanti for the Postal Service, settled the grievance. (ECF No. 42 Ex. U at WJ 1-3; Jones Dep. 39:9-11, 20-25, 40:1, 48:22-49:2, 75:8-12; Traficanti Decl. ¶ 8.)[20] Plaintiff indicates that his consent was not sought prior to this agreement to settle the matter. (Jones Dep. 40:6-7.)

The March 25, 2015 Pre-Arbitration Settlement Agreement states:

The grievant will be compensated a lump sum payment of $2,355.00, minus standard deductions, for pay [in] lieu of the work hours during the 30 days prior to the removal (6-22-14).

The grievant will have 30 days from the signing of this agreement to submit his resignation, if he does the resignation will be accepted & the removal expunged

---

[20] Jones could not explain why the settlement was dated a month after the scheduled hearing date, but stated that he believed it had been reached prior to the date it was committed to writing. (Jones Dep. 39:16-23.)

13

from his record.

> If a resignation is not submitted the removal will stand.

(Ex. U at WJ 2; Traficanti Decl. ¶ 9.) Plaintiff did not submit the resignation, and his removal became effective on June 22, 2014. (Freeman Dep. 118:3-4; Ex. B at 2; Traficanti Decl. ¶ 9.) Plaintiff responds that his grievance requested reinstatement, not resignation.

> Jones testified as follows:

> Q: Let me ask you: what were the circumstances leading up to this settlement agreement?
> A: Mr. [Traficanti] is the first management person entertaining paying him for 30 days, and again, I told you I didn't have – didn't believe we would prevail in front of an arbitrator.
> Q: You say again that was because of the number of accidents within a certain period of time?
> ***
> A: Yes.
> ***
> Q: And, would that agreement have been worked out between you and Mr. [Traficanti]?
> A: Yes.
> ***
> Q: Did Mr. Freeman have any involvement?
> A: No.
> Q: And was the union required to involve Mr. Freeman in whether an agreement would be reached?
> A: No.
> Q: Not by contract, or anything else that would have required the union to involve him; correct?
> A: No.

(Jones Dep. 37:24-25, 38:1-8, 39:24-25, 40:1, 6-13.) Plaintiff disputes this testimony, contending that the Postal Service breached the CBA by taking his first accident into consideration and the Union switched positions, from arguing that his discipline was punitive rather than corrective in nature to accepting the Postal Service's position that he had been at fault in three accidents. (ECF No. 42 Ex. S at 2; Jones Dep. 28:13-29:11, 38:5-8.)

> When asked why a provision allowing Plaintiff to submit a resignation in lieu of his

removal was included in the Pre-Arbitration Settlement Agreement, Jones testified:

> A: Again, we weren't pursuing the removal to arbitration, because we didn't have reason to believe that we could prove it out, and wanted to go, normally try to give the person … the opportunity to resign, so they don't have a removal on their record for when they are seeking future employment.
> Q: Okay. Was that requested, did you make the request for him to be able to change his removal to a resignation?
> A: Yes.
> Q: And, Mr. [Traficanti], obviously, that was eventually agreed to, was that initially agreed to when you first asked for that?
> A: Mr. [Traficanti] was the first one that entertained settling anything on the case for the 30 days.

(Jones Dep. 41:13-25; ECF No. 42 Ex. U at WJ 2-3.)

He testified further:

> Q: How many discussions did you have with [Traficanti], prior to preparing this settlement agreement?
> A: Probably no more than two or three.
> ***
> Q: At what point – did you share with him, at any point, that the union believed it wouldn't prevail at arbitration?
> A: I did when I wrote it, apparently.
> Q: Okay. Any attempt prior to that, did you have any discussion --
> A: Probably in the last discussion, when we were – you know, if they were going to pay him what he definitely was entitled, then I would consider resolving the case.
> Q: And did you have any discussions with Mr. [Traficanti], about the possibility of bringing Mr. Freeman back to work?
> A: At the beginning, I try to get everything I can.

(Jones Dep. 42:1-3, 10-20; Traficanti Decl. ¶ 10.)

He testified further:

> Q: Sir, as you sit here today, is it your position that the union took all of the steps that were necessary under the contract, to pursue the grievance on behalf of Mr. Freeman?
> A: Yes.
> Q: At any time was it determined, by the union, that something should have been done for Mr. Freeman, that wasn't?
> A: No.
> Q: And, at any time was it determined by the union that something should have been handled differently, with respect to Mr. Freeman's grievance?

A: No.

(Jones Dep. 48:8-18.)

Finally, he testified that:

Q: Based on your understanding of the national agreement, the JCIM, and the MOU, did the union have any obligation to continue pursuit of the grievance, once the union determined that the arbitration would not be fruitful?
A: Do we have any obligation? No.
Q: And similarly, based on your understanding of the national agreement, the JCIM and the MOU, did the Postal Service have any authority to continue Mr. Freeman's grievance process, if the union decided not to?
***
Q: You can answer. In other words, the Postal Service doesn't proceed with these grievances on behalf of individuals, the union does?
***
A: The union moves the grievances forward.
Q: Did the union have any obligation to consult with, or include Mr. Freeman on any of the decision making with respect to any of the steps along the grievance process?
A: No.

(Jones Dep. 52:5-24; Traficanti Decl. ¶ 11.)

Daniel J. Traficanti, an experienced Labor Relations Specialist for the Postal Service, states further that "[b]ased on [his] knowledge of the CBA and procedures in connection with the grievance process, the Postal Service appropriately and timely responded to each step of the grievance that the Union pursued on behalf of Mr. Freeman." (Traficanti Decl. ¶ 12.)

Jones testified further:

Q: At any time throughout the grievance process, as it relates to Mr. Freeman, did anyone at the Postal Service pressure the union, or try to influence the union to take a particular course of action?
A: No.

(Jones Dep. 52:25-53:4.)  He explained further with regard to Plaintiff's March 2014 accident:

Q: So it's fair to say that in preparation for Mr. Freeman's grievance, you never looked at the nature of this incidents that occurred with regard to his record; is that correct?
***

16

A: No, that's not fair to say.

Q: Okay. How would you have considered the nature of the incidents that he was involved in?

***

A: He had a number of accidents in a short period of time.

Q: But you never went and looked at the fact that the second incident was not an at fault incident? You didn't consider that; is that correct?

***

A: That case was settled prior to getting into my hands.

Q: Okay. You said that twice already. But the fact of the matter was, you didn't have an understanding that the second incident was not at fault?

A: Pulling out from a curb hitting somebody is at fault.

(Jones Dep. 81:15-23, 82:2-12.)

<u>Alleged Race Discrimination</u>

In his Amended Complaint, Plaintiff states:

The Postal Service's decision to remove Freeman was discriminatory (as he was African-American and Black) and did not treat him as similarly situated employees who were white.

(ECF No. 10 ¶ 39.) At his deposition, Plaintiff described himself as "American with African heritage." (Freeman Dep. 28:17-18.) The people who Plaintiff believes discriminated against him on the basis of his race are Dorothy Bradshaw, Glenn Ramsey, Tom Dziubinski and Anthony Battle. (Freeman Dep. 30:15-21.)

Plaintiff testified as follows:

Q: Can you explain what you mean by color when you say that you were discriminated against on the basis of your color?

A: Black.

Q: And are you distinguishing that from African-Americans you may consider not to be black?

A: They call us all black.

Q: So are you making a distinction between your African-American race and your color? Or, to you, are they one in the same?

A: They are one in the same.

(Freeman Dep. 27:12-22.)

When asked why he believes he was terminated on the basis of his race, Plaintiff testified

as follows:

> A: Why I was terminated on the basis of my race? Well, actually, I refuse that. I do not accept the fact that you call me black. I consider myself of American heritage.
> Q: Sir, I'm not attempting to offend you for any reason.
> A: I'm just putting that out there. If you call me black, I refuse to be called that. I guess these people wanted to show me that "you are black."
> \*\*\*
> Q: Sir, we were talking about why you believe that you were discriminated against on the basis of your race. I don't think I let you finish your answer. So you can continue.
> A: I refuse to be called black because, that, I am not.
> \*\*\*
> Q: You claim in this lawsuit that you believe you were terminated on the basis of your race; correct?
> \*\*\*
> Q: So you are nodding your head, yes? I am asking you.
> A; Because of the color of my skin.
> Q: Right. But why?
> A: People discriminate against people regardless to me of race, color or whatever.

(Freeman Dep. 28:1-10, 23-25, 29:1-3, 30:1-3, 7-8, 11-14.)

Plaintiff testified further as follows:

> Q: Has anybody told you or given you any sort of indication that Mr. Ramsey, Ms. Bradshaw, Mr. Dziubinski or Mr. Battle didn't like African-Americans?
> A: No.
> Q: Or somehow treated people differently because of their African-American race?
> A: I'm only concerned of me. I don't get involved in that.
> Q: Anybody else that we haven't discussed who you believe discriminated against you because of your race?
> A: No.

(Freeman Dep. 39:11-19, 25, 40:1-3.)

<u>Glenn Ramsey</u>

Ramsey is African American. (Bradshaw Dep. 24:12-14; Freeman Dep. 31:2-3.) When asked why he believes Ramsey discriminated against him on the basis of his race, Plaintiff testified as follows:

A: Because of my -- because, like I said, I refuse to be called black.

\*\*\*

Q: Any other reason why you think Mr. Ramsey would discriminate against you?

A: He wanted to prove that I am a black person.

Q: I don't understand. Can you explain what you mean by that?

A: I refuse to be called black. And people that are Americans of African descent kind of get offended, or they think you are better than them when you don't allow them to call you black.

Q: Did you ever have any discussions that you specifically remember with Mr. Ramsey with respect to that issue?

A: No, other than I don't accept the fact that you are going to call me that.

Q: Did you specifically tell him you didn't want to be called black?

A: Yes.

(Freeman Dep. 30:25, 31:1, 4-20.)

Plaintiff testified further:

Q: So can you help me understand what that has to do with your termination?

A: Huh?

Q: Can you help me understand what this disagreement you had –

A: Because –

Q: Let me finish. What that has to do with your termination?

A: I would not let these people break my will.

Q: Can you explain what you mean by that?

A: I am a highly motivated person, and I'm not going to let anyone take that from me. And I guess the standards that I keep within me didn't agree with them. So I guess it was one of those things where, "Okay. We're going to show you because we are bigger than you because we hold these positions."

(Freeman Dep. 32:2-18). Plaintiff testified further:

Q: So you believe that Mr. Ramsey was trying to exert power over you in some way because he was a supervisor?

A: They all do it.

Q: The people we just mentioned?

A: Yes.

Q: But you believe that's because of your race?

A: No, because of my color. I refuse to be called black.

Q: Any other reason other than what you have just talked about that makes you believe that Mr. Ramsey would discriminate against you because of your race?

A: No other reason.

Q: Have you ever heard Mr. Ramsey say anything about having issues with other people who are of African-American descent?

A: I don't get into that. All I know is me. If that person doesn't mind being called that, then that's on that person.

Q: So I'll take that as a no? Would you like me to repeat that question?
***
A: Can you repeat the question, please?
(Record read.)
A: No. Like I said, no, I'm just concerned with me.
Q: Are you specifically aware of anything that would give you reason to believe that Mr. Ramsey would discriminate against others who are of African heritage?
A: Not that I know of. Like I said, I'm only concerned of me.

(Freeman Dep. 32:25, 33:1-25, 34:1-9.)

Dorothy Bradshaw

Dorothy Bradshaw is African American. (Freeman Dep. 36:16-18; Bradshaw Dep. 8:1-3.)

When asked why he believes Bradshaw discriminated against him on the basis of his race,

Plaintiff testified as follows:

Q: What is it about Ms. Bradshaw that makes you believe she discriminated against you because of your race?
A: Because, like I said, I refuse to be called black. And this lady literally admitted to another person that she does not like me.
Q: Did that person say why?
A: Well, like I said, the supervisors down there, they have this thing where they are in power. And I made a comment where she feels she has the Napoleon complex.
Q: You made that comment about Ms. Bradshaw?
A: Yes. But it wasn't directed towards her.
Q: Do you know your comment made it back to Dorothy Bradshaw?
A: Yes, it did.
Q: Who was this other person?
A: Joanne Gifford.
Q: Was it your understanding that Joanne was sharing with you that Dorothy Bradshaw didn't like you because of the comment you made about her being Napoleon?
A. Yes.
Q: Sir, is there any other reason why you think Dorothy Bradshaw would discriminate against you because of your race?
A: I refuse to be called black.
Q: Any other reason other than that?
A: There is no reason other than that, not that I can think of.
Q: Do you know or are you aware of anything that would give you the idea that Ms. Bradshaw would discriminate against African-Americans or people of African descent?
A: Like I said, I'm only concerned of me. That, I would not know.

(Freeman Dep. 34:15-35:25.)

Plaintiff testified further:

Q: Do you believe there was anything wrong about Ms. Bradshaw giving it [the Notice of Removal] to you?
A: Yes.
Q: What was wrong about that?
A: She wanted to show me she had more power than I thought she had.

(Freeman Dep. 51:14-19.) Plaintiff testified further:

Q: Anything else?
A: I guess they did not like me.
Q: And why, again?
A: Because of my motivation. I would not let anyone break my will or my spirit or my character.

(Freeman Dep. 52:1-5.)

Tom Dziubinski

Dziubinski is Polish. Plaintiff described him as an American of European Descent.

(Freeman Dep. 36:19-23; Dziubinski Dep. 7:5-12.) Plaintiff testified as follows in his deposition regarding Dziubinski:

Q: What is the basis for your belief that Mr. Dziubinski would discriminate against you by terminating you on the basis of your race?
A: I refuse to be called black. And these people are going to show me that "you are black," and I am not black.
Q: So when you say that these people are going to show you –
A: I'm talking about the supervisors.
Q: Let me finish. What exactly are you referring to? I need specifics. This is the time for you to tell me about your lawsuit.
A: Well, ask your question again, please.
Q: When you say these people are going to show you that you're black, was that your testimony?
A: Yes.
Q: What is it that you mean by that?
A: It's, like, a class that this country puts us in. You're either in the black class, or you're in the white class. You are in the Chinese class, Japanese, by race.
Q: Keep going.
A: And I refuse to be classified as a color. I just refuse to be classified as a

color.
Q: So what is it that makes you believe that Mr. Dziubinski was classifying you
by color?
A: When you call me black.
Q: Anything else?
A: The way that I carry myself.
Q: Do you -- is there anything that has made you believe that Mr. Dziubinski
would discriminate against people who are of African heritage?
A: I'm only concerned of me. I wouldn't know that.

(Freeman Dep. 36:24-25, 37:1-25, 38:1-8.)

Anthony Battle

Battle is African American. (Freeman Dep. 38:21-22; Bradshaw Dep. 8:9-11;  Battle

Dep. 105:5-7.) Plaintiff testified as follows regarding Battle:

Q: And why do you think -- what makes you believe that Mr. Battle would want
to discriminate against you by terminating you on the basis of your race?
A: I refuse to be called black.
Q: Anything else, sir?
A: No.
Q: Is there anything that you are aware of that would give you the impression that
Mr. Battle would want to discriminate against people of African descent?
A: I'm only concerned about me. I wouldn't know.

(Freeman Dep. 38:23-39:10.).

Plaintiff testified further as follows:

Q: Anything else about Mr. Battle that we haven't discussed in connection
with his involvement with your termination, or why you believe he discriminated
against you because of your race?
A: What are you asking?
Q: Anything else we haven't talked about?
A: As far as?
Q: As far as why you believe he discriminated against you because of your race?
A: Like I said, I'm not going to let these people break my will, and I refuse to be
called black.

(Freeman Dep. 54:17-55:2.)

Daniel Traficanti

Daniel Traficanti, the Labor Relations Specialist who reviewed Plaintiff's accident,

discipline and Union grievance records, and who settled Plaintiff's grievance prior to the

scheduled arbitration, states as follows:

> At no time during my involvement with Mr. Freeman's case did I come to believe
> or suspect that the circumstances or decisions surrounding Mr. Freeman's
> removal were motivated in any way by race discrimination, either on the part of
> the Supervisor(s), the Transportation Manager, or the Union.

(Traficanti Decl. ¶¶ 6-8, 13.)

<u>William Jones</u>

William Jones, Vice President and Business Manager for the Union, explained further

with regard to Plaintiff's claims of race and color discrimination:

> Q: Do you have any reason – as you sit here today, do you have any reason to
> believe that Mr. Freeman – that Mr. Freeman's removal was recommended on the
> basis of his race or his color?
> A: No.
> Q: As you sit is here today, do you have any reason to believe that Glen Ramsey
> would have taken any action against Mr. Freeman, on account of his race or his
> color?
> A: No.
> Q: Same question with respect to Dorothy Bradshaw?
> A: No.
> Q: Same question with respect to Tom Dziubinski?
> A: No.
> Q: Same question as it relates to Anthony Battle?
> A: No.

(Jones Dep. 53:5-19).

<u>William Weisser</u>

William Weisser, a Union Steward, testified further as follows:

> Q: Have you ever witnessed any instances where black employees were provided
> favorable treatment over white employees?
> ***
> A: No, I don't believe so.
> Q: Have you ever witnessed any instances where white employees were given
> favorable treatment over black employees?
> ***
> A: No, I don't believe that's true either.

Q: Have you ever witnessed any instances where there were light-skinned African-Americans who received more favorable treatment than darker-skinned African-Americans?
***
A: No.

(Weisser Dep. 10:18-20, 11:2-5, 8-12, 15.)

Antoine Gibson

Plaintiff identified Antoine Gibson as a witness. (Freeman Dep. 144:23-25, 145:19-25,

146:1-5; Ex. Z at 3.)  Antoine Gibson, who is African American, testified as follows:

Q: Do you recall any instances where any employees were involved in at-fault accidents where they were not disciplined?
***
A: At-fault accidents?
Q: Yes.
A: Not to my recollection, no. At-fault accident, typically they do whatever investigation there is, there is a protocol of discipline that they are supposed to follow and they typically do it, as far as I know.

(Gibson Dep. 22:7-18, 38:9-13[21]; see also Washington Dep. 23:10-13, 24:2-6.[22])

He testified further as follows:

Q: Did you ever see him [Anthony Battle] treat African American employees more harshly than their white colleagues?
A: Not more harshly, no.
Q: Did you ever see him treat the white employees different than the African American employees?
A: No.
Q: Okay. One of the witnesses describe Mr. Battle as a bully. What's your take on that?
A: I've heard it plenty of times, yup.

(Gibson Dep. 25:23-25, 26:1-7.)

Wesley Johnson

Plaintiff identified Wesley Johnson as a witness. (Freeman Dep. 144:23-25, 145:19-25,

---

[21] ECF No. 42 Ex. W.
[22] ECF No. 42 Ex. V.

146:6-10; Ex. Z at 3.)  Wesley Johnson is a former PSE and now full-time Postal Service driver

who grew up with Plaintiff in the City of Pittsburgh and has known him since childhood.

(Johnson Dep. 6:24-25, 7:1, 12-25, 8:1-5.)[23]

> Johnson, who is African American, testified as follows:
>
> Q: Are you aware of management treating any white employees more favorable than African American employees?
> ***
> A: No.
> Q: Okay. Are you aware of management treating any light skinned employees – light skinned African American employees more favorable than dark skinned African American employees?
> ***
> A: No.

(Johnson Dep. 13:14-16, 18:3-5, 7, 9-12, 14.)  He testified further as follows:

> Q: Did Mr. Freeman ever complain to you about management?
> A: Yes.
> Q: Do you recall what he complained to you about?
> A: Multiple, multiple problems.
> ***
> Q: And have you ever had any interactions with Mr. Battle?
> A: Yes.
> Q: And how have you found those interactions to be with Mr. Battle?
> A: They varied.
> Q: Could you describe what you mean by varied interactions with Mr. Battle?
> A: Some positive, some negative.
> Q: Let's start with the positives. Can you recall any specific positive interactions with him?
> A: Yes, yesterday.
> Q: And what was your interaction like?
> A: Positive. Real good.
> Q: Was he courteous to you?
> A: Yes.
> Q: Did he respect you?
> A: Yes.
> Q: Did he speak with you in a pleasant tone?
> A: Yes.
> Q: Any other specific positive interactions you've had with Mr. Battle?
> A: Yes.

---

[23] ECF No. 42 Ex. Y.

Q: Do you want to describe those?
A: Yeah, when he promoted me to a 204B supervisor.

(Johnson Dep. 19:1-5, 14-25, 20:1-13.) He further testified regarding a negative interaction he

had with Anthony Battle when Battle was not able to contact Johnson, as follows:

Q: Okay. And what was the result of that? Did he – let me ask you something. During that interaction with him, did you find him to be courteous?
A: No.
Q: Did you find him to be respectful of you?
A: No.
Q: And did he use a pleasant tone with you?
A: No.

(Johnson Dep. 29:7-19, 23-25, 30:1-6.) He testified further as follows:

Q: Did he [Anthony Battle] make any statements to you with regard to your not being a 204B supervisor anymore?
A: Yes.
Q: What did he say?
A: I wish you would stay in office.
***
Q: What did you understand him [Anthony Battle] to mean by that statement?
A: Well, he wished that I wouldn't want to go back to driving. He wanted me to stay as a supervisor, because he felt I was a good supervisor.

(Johnson Dep. 30:20-24; 41:13-18.)

He testified further as follows:

Q: While you were employed as a PSE MVS, did you ever witness any instances where white employees were provided more favorable treatment than African American employees?
***
A: No.

(Johnson Dep. 32:12-15, 18.)

<u>Alvin Washington</u>

Plaintiff identified Alvin Washington as a witness. (Freeman Dep. 144:23-25, 145:19-25,

146:1-5; Ex. Z at 3.) Washington, an African American former PSE and now full time Postal

Service driver, testified as follows regarding Glenn Ramsey:

Q: Do you know of any instances where Mr. Ramsey didn't treat people fairly?
***
A: I can't say. I can't recall him just, I mean, with us, he worked, I feel like he worked us all -- all of us PSE's, he always tried to give us hours. He always used to try to give us over 40 hours a week. So, whether we got it in the night or the day, he never did anything, you know, to me.

(Washington Dep. 6:13-17, 25, 7:1-3, 17:9-10, 13-19, 31:19-22.)  He testified further as follows

regarding Anthony Battle:

Q: Did you know of any instances where he, Mr. Battle, gave more favorable treatment to white employees than African American employees?
***
A: No, he -- he do it all the same. He don't -- he ain't -- he ain't our favorite person in driving, hardly no drivers, so that's white and black, so –
Q: He goes after all of you?
A: Mm-hmm, the same.

(Washington Dep. 20:19-21, 24-25, 21:1-4.)  Plaintiff notes that Washington also testified as

follows:

Q. And I think I'm not sure if I heard you clearly earlier, but did you testify that you believe Mr. Battle would make up a reason to terminate somebody?
A. No, I don't think he would make up a reason, but, you know, he'll try to use anything to try to get you, the steps to get you out of here. He tried, you know, he has initiated, like I said, against me personally. That's why I know personally, you know, he tried to go to the extreme, like with a PDI. And then back in April my, -- I missed a --two days, off two days for being sick and that's when he came back and tried to give me a seven-day suspension. And we grieved that. So, that actually is nothing now, because my PDI for the level 1 got thrown out, so that seven day automatically disappeared. So, that's just grievances out there. I don't know what it --that actually knocked the other one out. So, he has, you know, he has tried to go to the point where he build up stuff on me, you know, to keep, you know, just to make like a trap for me. I fell in a trap. So, he is known -
Q. So, he comes down hard on people when something happens?
A. To the extreme, to the extreme. So, that's how I feel. He has got some grievances for being an abusive supervisors [sic]. And the way he talk to you ain't right. Like I said, he don't people to people like you should be talking to somebody as, like we all – here we are all grown men. He tried to come at me like did you hear me? Did you hear me?
If a supervisor tell you to do something – I remember one instance, and I just walked off. He was on the phone trying to tell me, I'm a grown man, I got kids, I'm going to holler at my kids. If a supervisor tell you to come here, you come here, you hear me? I walked off. First of all, you ain't supposed to talk to me, I'm

already off the clock. I'm not your kid. So, I walked off. So, I already know the grievance that he got for being abusive supervisor, he got a couple of weeks ago with a driver, they going back and forth, over the radio.

Q. What did you hear about the grievance that was filed against him for being an abusive supervisor, what do you know about that?

A.I don't know what happened with it, but I know there's more than one been filed.

(Washington Dep. 33:4-25, 34:1-25, 35:1-3.)[24]

Q. But do you know of any instances where, while you were a PSE, white employees might have received more favorable treatment than you or your colleagues that were African Americans?

***

A. I can't, you know – I know, as far as treatment, you know, I always been treated, you know, l feel the same here as a –but I know, as far as accidents go, Richard Hipkiss, he, see, I don't really look at it in our department, you know, its black and white and female and male, so I look at it, we call each other drivers. So, I know Richard Hipkiss he had an accident or two when we were PSE's. And he was terminated and then he was brought back.

And Donnie Smith, he retired. He had an accident – he might have hit something, but he was an older driver. He isn't white. He's like light skinned, because I know his family out of Aliquippa, they are just light skinned people.

(Washington Dep. 11:7-25, 12:1-2.)

Q. Do you know of any white drivers who were terminated who were then rehired?

***

A. Like I said, in the beginning, Mr. Hipkiss, he was, when he was a PSE, he had multiple accidents, and he returned. Steve McCloskey, he had accidents, he was let go for like, I believe, like five or six months, but he was allowed to – he came back. He is still working here.

Q. Do you think those two instances were unfair to Mr. Freeman, that they let these two guys come back –

***

Q.– that they let these two guys come back, but they didn't let Mr. Freeman come back?

A. Well, yeah, I figure everything should be equal. If the union can fight for – if they union can fight tooth and nail and we all pay union dues, yeah, they should make a little more effort.

(Washington Dep. 22:2-25, 23:1.)

---

[24] ECF No. 48 Ex. 4.

Plaintiff's Hybrid Claim

Plaintiff testified as follows regarding his allegation that the Postal Service breached the

CBA:

> Q: Concerning you, what did the postal service do that breached the contract?
> A: They fabricated an incident that happened.
> Q: Sir, are you contending that your termination was a breach?
> A: Yes.
> Q: Anything else?
> A: And the fact that I was discriminated against.

(Freeman Dep. 130:16-24.) Plaintiff testified further as follows:

> Q: What procedures do you think the postal service should have followed that
> they didn't after incident No. 3?
> A: Who did the investigation of that incident? Was there an investigation done on
> that incident? Was there an investigation done on any of my incidents?
> Q: What else?
> ***
> A: Like I said, I wasn't informed on if there was an investigation done. And I
> really can't elaborate on that because I'm not in a position to do that.
> Q: What do you think the postal service should have done rather than recommend
> your termination and terminate you?
> A: Like I said before, did they really investigate it?
> Q: Do you think there should have been a different outcome?
> A: I can't say that because who did the investigation?

(Freeman Dep. 131:13-19, 132:3-15.) Plaintiff testified as follows regarding his allegation that

the Union breached its duty of fair representation:

> Q: What are you alleging that the union did that breached their duty of fair
> representation?
> A: They did not represent me.
> Q: And how do you mean? Can you be more specific?
> A: I was not allowed to be at any of the proceedings that happened and the fact of
> the matter that they told me that they are not going to represent me because they
> feel they cannot win my case.
> ***
> Q: Anything else that the union did or did not do that you feel was in breach of
> their duty of fair representation?
> A: I feel they discriminated against me.
> ***
> Q: What evidence do you have of that?

A: Look at what they did for Richard Hipkiss.
Q: That's the evidence you believe shows they discriminated against you because of your race?
A: Why wouldn't they do it for me?
Q: I know you're not asking me to answer that question. But that's the question, why not you?
A: Yes. If they are going to be fair and impartial, why wasn't it fair and impartial for me?
Q: What other evidence do you have that the union would want to discriminate against you because of your race?
A: What other evidence? Do I need more?
Q: I'm asking you if you have any more?
A: No.

(Freeman Dep. 132:16-24, 133:4-7, 134:15-25, 135:1-4.)

In a sworn statement submitted to the National Labor Relations Board (NLRB), Plaintiff stated that:

> I have no affirmative declaratory evidence to provide, such as threats not to represent me or statements concerning my race, that the Union representatives bore any animosity because of my race. I have information through another employee that the Union arbitrated grievances on behalf of white employees who had engaged in unsatisfactory performance and/or had failed to perform their duties in a safe manner, and their conduct had been equal or worse than the conduct for which the Employer had terminated my employment.

(ECF No. 42 Ex. BB ¶ 6.)

Plaintiff testified at this deposition that he stands by statement he made to the NLRB. (Freeman Dep. 128:3-19.) When asked whether there was anything else that made him believe that the Union either discriminated against him because of his race or breached its duty of fair representation, Plaintiff responded that, "[w]e talked about everything." (Freeman Dep. 137:3-11.)

Potential Comparators

Plaintiff points to three individuals as comparators, that is, similarly situated white employees of the Postal Service who allegedly received more favorable treatment than he did.

The Postal Service denies that these individuals are similarly situated.

<u>Richard Hipkiss</u>

Richard Hipkiss is a Caucasian MVO presently employed by the Postal Service. (Dziubinski Dep. 63:12-18[25]; Battle Dep. 82:16-17[26]; Hipkiss Dep. 12:14-15.[27]) Hipkiss was hired on or about June 16, 2012 as a PSE MVO. (ECF No. 48 Ex. 22 at USPS 26 (box 27).) Hipkiss was a PSE when both of his at-fault accidents occurred. He was later promoted to a Regular, Full-Time employee. (Washington Dep. 10:17-19[28]; ECF No. 48 Ex. 22 at USPS 3, 9, 26.) Battle described Hipkiss as an employee who had been involved in "several" accidents throughout the course of his employment. (Battle Dep. 82:12-15, 89:12-15; ECF No. 48 Ex. 22 at USPS 1; Hosack Dep. 44:24-25, 45:1-3[29].) To date Hipkiss has retained his position of MVO with the Postal Service. (Washington Dep. 22:3-11.)

Hipkiss' first accident occurred on March 4, 2013. On this date, Hipkiss was operating a spotter and pulling a trailer out from between two other trailers. (Hipkiss Dep. 10:2-4; ECF No. 48 Ex. 22 at USPS 40.) Hipkiss struck a parked POV while pulling the trailer out of a dimly-lit lot at the General Mail Facility. (Ex 22 at USPS 33, 40.) According to Hipkiss, the vehicle was not parked there when he arrived, and he did not see the vehicle before he left. (Hipkiss Dep. 10:2-11; ECF No. 48 Ex. 22 at USPS 41, 49.) The accident caused significant damage to the POV. (<u>Id.</u> at USPS 3.)

The accident was investigated by Ramsey, Dziubinski, and Battle, and Hipkiss was

---

[25] ECF No. 48 Ex. 6.
[26] ECF No. 48 Ex. 20.
[27] ECF No. 42 Ex. X.
[28] ECF No. 48 Ex. 4.
[29] ECF No. 48 Ex. 23.

charged with an at-fault accident. (Battle Dep. 85:3-9, 86:2-3[30]; ECF No. 48 Ex. 22 at USPS 38, 50.) A Union Representative spoke to the Dock Supervisor for additional details, and was informed that the driver of the POV had been warned against parking in that location. (Id. at USPS 41.) The USPS accident report indicates that the owner of the vehicle played an "active role" in the stated accident by parking improperly. (Id. at USPS 43.)

Hipkiss was originally served a Notice of Removal on March 13, 2013. (Battle Dep. 86:15-17; ECF No. 48 Ex. 22 at USPS 30, 33.) A grievance was filed and his removal was reduced to a suspension at Step 3 of the grievance process. (Hipkiss Dep. 12:3-10.)[31] Hipkiss served a seven-day suspension for the March 4 incident and returned to work on March 17, 2013. (Hipkiss Dep. 11:12-14[32]; ECF No. 48 Ex. 22 at USPS 36.) He also received 40 hours of paid leave. (Id. at USPS 32.) Defendant adds that the record reveals that Hipkiss was brought back because of an alleged unfair labor practice on the part of an unnamed manager, a circumstance not present in this case. (ECF No. 42 Ex. U at WJ 88.)

According to Jones, the Postal Service "gave in" during the grievance process because the manager at the time – who may have been Battle –had attempted to negotiate directly with Hipkiss, separately from the Union. (Jones Dep. 57:17-20, 58:1-6, 17-20.)[33] Battle denied ever having been charged with such a transgression. (Battle Dep. 110:14-21.)[34]

Hipkiss' second accident occurred on August 26, 2013 on the West End Bridge. This accident occurred when Hipkiss side-swiped a POV driving on his left, causing significant damage. (ECF No. 48 Ex. 22 at USPS 5, 17.) The postal vehicle caused significant damage to the

---

[30] ECF No. 48 Ex. 20.
[31] ECF No. 42 Ex. X.
[32] ECF No. 48 Ex. 21.
[33] ECF No. 58, Supp. Ex. 12.
[34] ECF No. 48 Ex. 20.

POV, damaging the side mirror and removing the protective cover surrounding the mirror. (Id. at USPS 25, 239-42.)

As Hipkiss explained, a construction sign on the right side of the road caused him to "hug the line" on the left. As a result, the rear tire of the postal truck crossed into the opposite lane and sideswiped the rear tire of a POV. (Hipkiss Dep. 6:19-21; ECF No. 48 Ex. 22 at USPS 2, 5.) The accident was investigated by Dziubinski and Ramsey. (Id. at USPS 15, 28, 40.)

Hipkiss' Union Representative at the PDI defended, claiming that the accident happened behind Hipkiss, and that Hipkiss could not have avoided it. (Id. at USPS 16.) In the PDI, Dziubinski described the accident as the "tire and mirror touching." (Id. at USPS 11, 22.)

The accident report further claimed that the driver of the POV played an "active role" in the incident by failing to check her clearance. (Id. at USPS 27.) However, Hipkiss admitted that he was aware that his postal vehicle had crossed outside of his traffic lane and into the lane of the POV. (Hipkiss Dep. 7:5-11.)[35]

As a result of this accident, Hipkiss was assigned to the clerk's office for a period of thirty days. (Hipkiss Dep. 7:15-17) He was issued a Notice of Removal on August 30, 2013 and removed from employment with the Postal Service. (Battle Dep. 87:17-22; ECF No. 48 Ex. 22 at USPS 5.) On December 30, 2013, Hipkiss' removal was officially reduced to an LOW, and Hipkiss was instructed to return to work by January 4, 2014. (Id. at USPS 2-3.) Battle was uncertain at what Step of the grievance process this occurred. (Battle Dep. 89:3-4.)

John McCartney

John McCartney is a Caucasian male who has been employed as a Postal Service MVO

---

[35] ECF No. 48 Ex. 21.

since December 10, 2011. (Johnson Dep. 13:17-23; Battle Dep. 103:20-21[36]; ECF No. 48 Ex. 26 at USPS 407.) McCartney has been involved in three motor vehicle accidents throughout his tenure as an MVO, all occurring while he was employed as a PSE MVO. (Battle Dep. 96:22-24; ECF No. 48 Ex. 26 at USPS 350 (box 17), USPS 385 (box 17), 404, 407, 421.)

McCartney's first accident occurred on November 23, 2012. (Id. at USPS 411, 421.) The incident occurred when McCartney was driving through a construction zone and his driver's side mirror struck a construction sign on the side of the road. (Id. at USPS 414-15, 423.) The accident was investigated by Ramsey, Dziubinski, and Battle, who ultimately determined that McCartney was at fault for the accident. (Battle Dep. 97:7-12; ECF No. 48 Ex. 26 at USPS 405, 421.) As a result, he received a discussion in lieu of formal discipline, as well as additional training. (Battle Dep. 98:16-25; ECF No. 48 Ex. 26 at USPS 419-21.)

McCartney's second accident occurred on February 9, 2013. (Id. at USPS 340-42, 350.) He was rear-ended by a POV while stopped at a red light. (Id. at USPS 368-70.) No damage was done to the Postal vehicle; however, the POV was totaled. (Id. at USPS 365.) A police report was filed and McCartney was determined to be not at fault for the accident. (Battle Dep. 99:9-15; ECF No. 48 Ex. 26 at USPS 358-59.)

McCartney's third accident occurred on October 3, 2013, when he opened his driver side door to exit the vehicle and struck an oncoming POV. (Id. at USPS 344-46.) The impact broke the passenger side mirror and damaged the rear window of the POV as well as the driver's side door frame of the postal truck. (Id. at USPS 384-85.)

Battle testified that McCartney was determined to be not at fault for this accident, despite carelessly having opened his door into oncoming traffic:

_____

[36] ECF No. 48 Ex. 20.

Q. And does it [the accident report] give any other indication on what happened?
A. Yes, in this accident, as explained in Item 38, he was opening his door and he was struck by a POV as he was opening the door and her mirror was damaged.
Q. And was he ascribed fault for that incident?
A. No.
Q. He was not?
A. No. Not to recollection he wasn't.
Q. Okay. Does that form give any indication of whether or not Mr. McCartney received any training or anything of that nature?
A. No, it doesn't indicate any retraining, no.
***
Q. Is there any indication ascribing fault to Mr. McCartney in that[October 3, 2013] incident?
A. No.

(Battle Dep. 100:7-20, 101:6-8.)

Despite his testimony that McCartney was not a fault for the October 3, 2013 accident, Battle also indicated that McCartney's "inattention" was a contributing factor to the accident. (ECF No. 48 Ex. 26 at USPS 386.)  He testified:

Q. Had he been paying attention and checked his mirror, would not he have observed the vehicle passing close to his vehicle?
A. Well, in this accident right here, even though I marked it as inattention on his behalf, that street is wide enough where that POV had enough room to clear his vehicle without striking it. The lady was too far over, But to clarify, he was told to start getting out on the passenger side, not to exit from the driver's side.

(Battle Dep. 102:4-13.)

<u>Charles McCloskey</u>

Charles McCloskey is a Caucasian male employed as a Full-Time MVO with the Postal Service. (Dziubinski Dep. 79:21-25[37]; ECF No. 48 Ex. 29 at USPS 99.)  McCloskey has been involved in three known motor vehicle accidents during his employment with the Postal Service. To date McCloskey remains employed with the Postal Service as an MVO. (Battle Dep. 89:16-

---

[37] ECF No. 48 Ex. 6.

23[38]; Hosack Dep. 44:18-21; ECF No. 48 Ex. 29 at USPS 100, 119.)

In addition to his motor vehicle accident history, McCloskey also served a seven-day suspension on approximately November 2, 2010 for exhibiting "Unsafe Work Habits." (ECF No. 48 Ex. 29 at USPS 121.)  An advisory letter dated November 11, 2011 indicates that McCloskey was involved in his first motor vehicle accident on October 21, 2011. No information was provided with regard to the details or disciplinary outcome of this accident. However, as of 2013, this accident no longer appeared on McCloskey's employment record. (Id. at USPS 119, 122.)

McCloskey's second accident occurred two weeks later, on November 2, 2011, when he struck a POV which was traveling straight as he attempted to make a left-hand turn into the Parkway Center postal facility.  A Notice of Proposed Removal was issued on November 10, 2011, and was reduced to an LOW on April 23, 2013. (Id. at USPS 120-22.)

McCloskey's third known accident occurred on September 17, 2014,when his postal vehicle drifted forward into a POV while he was stopped at a red light. (Id. at USPS 100, 109-11.)  McCloskey stated that his postal vehicle "drifted" into the POV, and that there was "nothing" he could have done to avoid the accident. (Id. at USPS 107, 113.)

Dziubinski investigated the accident (Id. at USPS 102-03, 105-07.)  McCloskey was determined to be at fault for the accident and was subsequently issued an LOW on September 26, 2014. (Battle Dep. 92:18-23; ECF No. 48 Ex. 29 at USPS 100.)  According to Battle, McCloskey was issued the LOW for his third motor vehicle accident because his previous disciplinary actions were "downgraded by labor," and the Postal Service was required to "start over in the process" of discipline.  (Battle Dep. 95:10-14.)  Battle further stated that McCloskey was "a full-time employee."  (Id. at 95:14-15.)  However, on November 11, 2011, Edward Hosack,

---

[38] ECF No. 48 Ex. 20.

Supervisor, Transportation Operations, received a "Confidential Advisory" that a removal (for McCloskey's second accident) would not prevail but that "the final decision on this matter is yours."  (ECF No. 48 Ex. 29 at USPS 119.)[39]

Procedural History

On March 23, 2015, with the assistance of his attorney, Plaintiff contacted an EEO counselor and prepared an "Information for Pre-Complaint Counseling."  (ECF No. 48 Ex. 13 at AF 211-12.)  On May 5, 2015, Plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"). (Id. at AF 233-34.)  By letter dated June 19, 2015, Plaintiff was notified of his right to file a formal EEO complaint, which he did. (Id. at AF 244-45.) On July 6, 2015, within fifteen (15) days of receipt of the notice, Plaintiff timely filed a counseled formal EEO complaint.  (Id. at AF 254-58.)  On August 5, 2015, the formal EEO complaint was dismissed. (Id. at AF 260-62.)

Plaintiff was advised that the proper forum for a complainant to have raised a challenge to decisions made by the Union was through the grievance process itself or before the NLRB. (Id. at AF 261.) On August 11, 2015, Plaintiff filed a Complaint with the NLRB and notified both the Union and the Postal Service. (ECF No. 48 Ex. 14 at AF 268.)  On August 13, 2015, he filed a revised Complaint with the NLRB. (Id. at AF 276-77.) The August 5, 2015 Notice of Dismissal also advised Plaintiff that he had a right to file a civil action in federal court in lieu of

---

[39] Plaintiff's Concise Statement also cites the experiences of Edward Williams (an African American MVO who was involved in three accidents but received only a seven-day suspension), Roseann Lee (a woman whose race is not identified and who was involved in four accidents and was issue a Notice of Removal but reinstated through the grievance process), and Donald Smith (an African American MVO who was involved in two accidents but whose LOW was expunged upon his retirement).  ECF No. 47 ¶¶ 147-54, 167-75, 185-206.  Plaintiff does not refer to these individuals in his brief or explain the relevance of their experiences to this case.

filing an appeal with the EEOC. (ECF No. 48 Ex. 13 at AF 262.)

Plaintiff filed this action on August 24, 2015, naming both the Postal Service and the Union as defendants (ECF No. 1). On October 26, 2015, the Postal Service filed a Motion to Dismiss. (ECF No. 4.) On November 11, 2015, Plaintiff voluntarily dismissed the Union from this case (ECF No. 9) and filed an Amended Complaint against the Postal Service, now the only defendant. (ECF No. 10.) Federal question jurisdiction is based on the civil rights claim. Count I alleged that the Postal Service treated him in a discriminatory manner in violation of Title VII when it terminated his employment for the May 13, 2014 motor vehicle accident, because similarly situated white employees were re-employed and/or re-hired at the same or similar pay position. He also alleged that the Postal Service falsely treated his two prior accidents as at-fault incidents in order to justify his termination; that the withdrawal of his grievance by the Postal Service and the Union was discriminatory as it deprived him of the right to have his grievance resolved; and that he was not advised of his Veterans' Preference rights. Count II alleges that the Postal Service breached the CBA by imposing discipline that was punitive in nature rather than corrective and that his removal was not for "just cause."

On December 4, 2015, the Postal Service filed a Motion to Dismiss the Amended Complaint. (ECF No. 15.) On February 25, 2016, a Memorandum Opinion and Order was filed, granting the motion in part (dismissing Plaintiff's claim arising under the Veterans' Preference Act) and denying it in all other respects (ECF No. 24).

On November 4, 2016, Defendant filed a motion for summary judgment (ECF No. 40). On January 16, 2017, Plaintiff filed a brief in opposition (ECF No. 50) and on February 20, 2016, Defendant filed a reply brief (ECF No. 54). On March 1, 2017, Plaintiff filed a motion for leave to file a supplement to his additional facts (ECF No. 58), and the motion was granted on

March 2, 2017 (ECF No. 59).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) Count I should be dismissed because Plaintiff points to no circumstances giving rise to an inference of race discrimination and even if he could state a prima facie case, he has no evidence of pretext that the proffered reason for his termination (having three motor vehicle accidents over a period of 18 months) is a pretext for unlawful race

discrimination; and 2) Count II should be dismissed because he points to no evidence that the Postal Service breached the CBA or that the Union breached its duty of fair representation.

Plaintiff responds that: 1) he did not have three "at fault" accidents, but rather the Postal Service exaggerated and misrepresented the incidents in order to justify his dismissal, and he was treated less favorably than similarly situated white employees, and Defendant's proffered reason for his dismissal is a pretext for unlawful race discrimination; and 2) the Postal Service breached the CBA by claiming that the accidents were Plaintiff's fault when it knew this was false and by citing the first accident despite the fact that no discipline was imposed, and the Union breached its duty to defend him when it withdrew his appeal, unlike the more favorable treatment given to similarly situated white employees with grievances.

In a reply brief, Defendant contends that: 1) the three individuals to whom Plaintiff compares himself are not valid comparators and he cannot demonstrate pretext by merely disagreeing with the Postal Service's conclusion that the accidents were his fault; and 2) contrary to Plaintiff's contention, the Postal Service did not breach the CBA by noting the first accident in the context of firing him and the Union was not required to continue to arbitrate his grievance once it concluded that it had no chance of succeeding.

Count I: Title VII

Title VII provides that "All personnel actions affecting employees or applicants for employment … in the United States Postal Service and the Postal Regulatory Commission … shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).  The statute further provides that an aggrieved party may file a civil action as provided in section 2000e-5, § 2000e-16(c), and that the provisions of section 2000e-5(f) through (k) shall govern these civil actions brought by federal employees, § 2000e-

16(d).

Defendant argues that Plaintiff has failed to state a prima facie case of discrimination,

citing to the familiar <u>McDonnell Douglas</u> burden shifting analysis. <u>McDonnell Douglas Corp. v.</u>

<u>Green</u>, 411 U.S. 792 (1973). As the Court of Appeals has explained, a Title VII plaintiff :

> bears the initial burden of establishing a prima facie case by a preponderance of the evidence. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. <u>Tex. Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. <u>Id.</u> at 253, 101 S.Ct. 1089; <u>McDonnell Douglas</u>, 411 U.S. at 804, 93 S.Ct. 1817.

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817; <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 348 n. 1, 352, 356 (3d Cir. 1999). However, the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied. <u>Geraci v. Moody-Tottrup, Int'l, Inc.</u>, 82 F.3d 578, 581 (3d Cir. 1996).

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797-98 (3d Cir. 2003) (footnotes omitted).

Defendant contends that Plaintiff cannot establish a prima facie case of race

discrimination because he points to no circumstances giving rise to an inference of

discrimination—he cannot compare himself to Hipkiss, who actually was treated more severely

(he was terminated after two accidents before his grievances succeeded in getting him

reinstated), and he has no other evidence to support his claim, including his claim that various

Postal Service supervisors conspired against him because he objected to being called "black."

Plaintiff responds that he can compare himself to Hipkiss and also to McCartney and McCloskey. Defendant replies that these are not valid comparators because they are not similarly situated.

The Court of Appeals has held that plaintiffs in discrimination cases "cannot selectively choose a comparator." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998). An individual must be similarly situated in all material respects. Lula v. Network Appliance, Inc., 2006 WL 1371132, at *5 (W.D. Pa. May 17, 2006 (Cercone, J.), aff'd, 245 F. App'x 149 (3d Cir. 2007). "In order for [individuals] to be deemed similarly situated, the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [defendant's] treatment of them for it." Jones v. Hosp. of Univ. of Pa., 2004 WL 1773725, at *6 (E.D. Pa. Aug. 5, 2004) (citation omitted).

Defendant argues that Plaintiff cannot maintain a prima facie case of racial discrimination because he cannot point to another similarly situated individual, that is a white PSE who was involved in three at-fault accidents but was not fired, and thus received more favorable treatment than he did. However, as the Court of Appeals has clarified, although some previous cases had created confusion by referring to favorable treatment outside the protected group as a prima facie case element, "[u]nder McDonnell Douglas, evidence of favorable treatment outside the protected class is not an element of a prima facie case." Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802). See also Simpson, 142 F.3d at 646 (evidence that a non-member of the protected class was treated more favorably is enough for purposes of the prima facie case and the issue of whether the individual is "similarly situated" is more appropriately addressed at the pretext stage of the

analysis). Thus, Plaintiff need not point to a white PSE with three accidents who not fired in order to state a prima facie case of racial discrimination. Moreover, he refers to three white Postal Service workers who were cited for multiple auto accidents, which is more than sufficient for purposes of a prima facie case.

Thus, Plaintiff has established a prima facie case of race discrimination. The burden shifts to Defendant to point to a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Defendant has met its burden by pointing to Plaintiff's history of motor vehicle accidents. See Raytheon Co. v. Hernandez, 540 U.S. 44, 51-52 (2003). Plaintiff contends that the accidents the Postal Service cites were "magnified and fabricated" to justify his termination.

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). Or put another way:

> [W]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995).

Thus, Plaintiff cannot demonstrate pretext by claiming that the Postal Service's conclusion that the second accident was his fault was wrong because the other driver turned in

front of him.[40]  As noted above, "it is not enough for a plaintiff to show that an employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." Abramson v. William Paterson College, 260 F.3d 265, 283 (3d Cir. 2001).

On the other hand, Plaintiff argues that he has evidence of pretext in the form of three similarly situated white Postal Service employees who received more favorable treatment. Defendant contends that the three employees are not similarly situated.

The Court of Appeals has stated that:

> to be considered similarly situated, comparator employees must be similarly situated in all relevant respects. Russell v. University of Toledo, 537 F.3d 596 (6th Cir. 2008); Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259-61 (5th Cir. 2009)). A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in. Lee, 574 F.3d at 259–261; Burks v. Wis. Dep't of Transp., 464 F.3d 744 (7th Cir. 2006).

Wilcher v. Postmaster General, 441 F. App'x 879, 882 (3d Cir. 2011).  However, to the extent that Defendant argues that the conduct must be "the same," the Court notes the following comment made by Judge Conti:

> Other courts have demanded that comparators' conduct be "the same." E.g., Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 269 (W.D. Pa. 2010) ("'[Comparators] ... must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (quoting Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002)) (emphasis added)). The court concludes that "similar conduct" is the more appropriate formulation, and the one relied upon more often and more recently by Court of Appeals for the Third

---

[40] In his brief, Plaintiff also makes a passing reference to the Postal Service's "failure to question [his] colleague Mr. Coleman, who [Plaintiff] advised Postal Service that he had witnessed the incident."  (ECF No. 50 at 17.)  However, his citation does not support this argument: he refers to the PDI, at which Ramsey asked him if he (Plaintiff) had any questions and Plaintiff asked if he talked to Edward Coleman and Ramsey responded "I have not had a chance yet."  (ECF No. 42 Ex. Q at BATTLE 79-80.)

Circuit—albeit in unpublished opinions. See Radue v. Kimberly–Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000), quoted favorably by Brown v. SEPTA, 539 Fed. Appx. 25, 28-29 (3d Cir. 2013) (per curiam); Amfosakyi v. Frito Lay, Inc., 496 Fed. Appx. 218, 224 (3d Cir. 2012) (per curiam); McCullers v. Napolitano, 427 Fed. Appx. 190, 195 (3d Cir. 2011) (per curiam); Houston v. Easton Area Sch. Dist., 355 Fed. Appx. 651, 654 (3d Cir. 2009); Opsatnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 223 (3d Cir.2009). But see Davis v. City of Phila. Water Dep't, 57 Fed. Appx. 90, 92 (3d Cir. 2003) (using the "the same conduct" formulation (quoting Anderson v. Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994))).

Mitchell v. City of Pittsburgh, 995 F. Supp. 2d 420, 431 n.3 (W.D. Pa. 2014).

Contrary to Plaintiff's assertions, Hipkiss is not a similarly situated employee. In fact, Hipkiss received more severe treatment than he did: the Postal Service tried to have him removed after his first and second at-fault accidents. After the first accident, the removal was requested by Ramsey and Battle concurred, and he was fired. (ECF No. 42 Ex. CC at USPS 33-34, 37-38.) After the second accident, the removal was requested by Dziubinski and Battle concurred, and he was again fired. (Id. at USPS 5-6, 11-12.) Even at the Step 2 level of the grievance, Battle insisted on removing Hipkiss. (Id. at USPS 3-4.) The fact that the Union was subsequently able to have Hipkiss' removals reduced to LOWs and obtain his reinstatement on two occasions does not demonstrate that he received more favorable treatment from the Postal Service, his employer, particularly when, as the Postal Service observes, neither Battle nor Dziubinski was involved in the grievance proceedings that achieved Hipkiss' reinstatement. (Id. at USPS 2, 32; Ex. U at WJ 88.)

McCartney's situation is more complicated. On the one hand, the Postal Service determined that McCartney was not at fault for his second accident (when he was rear-ended by a POV) and Plaintiff does not dispute this conclusion.[41] Unlike Plaintiff, therefore, McCartney was not involved in three at-fault accidents and could be said not to constitute a proper

---

[41] Plaintiff appears to challenge the Postal Service's conclusion that McCartney was not at fault for his third accident, noting that McCartney "carelessly" opened his door into a passing POV.

comparator. See Mitchell, 995 F. Supp. 2d at 432 (TD was a white paramedic who was investigated for allegedly striking a patient, but his supervisor concluded that the evidence did not support imposing discipline, unlike Mitchell, an African American paramedic who was alleged to have inappropriately touched a co-worker and there was some evidence to support the claim).

On the other hand, although the documents the Postal Service has submitted refer in general terms to progressive discipline, they do not mandate that an employee receive an LOW for a second at-fault accident or be terminated for a third one. See ECF No. 42 Ex. C at 149-50. Indeed, as noted above, the Postal Service tried to have Hipkiss removed after only his first accident. Thus, it is not clear that the question of comparators should be sliced as finely as Defendant does herein.

The Court need not resolve this question, however, because Plaintiff has established that McCloskey is a similarly situated employee: he was involved in three at-fault accidents, including a second one in which he struck a POV (just like Plaintiff) and a third one in which his vehicle "drifted into" the POV in front of him (just like Plaintiff), but he was issued an LOW instead of a Notice of Removal. In fact, McCloskey probably engaged in more serious conduct in that the record indicates he failed to report his accident for nearly five hours afterward. (ECF No. 48 Ex. 29 at USPS 100.)

Defendant argues that McCloskey is a "full-time MVO with the full panoply of progressive discipline rights," unlike Plaintiff, who was a PSE.[42]  However, the issue in Count I is not whether Plaintiff received the full range of progressive discipline rights (which is an

---

[42] As noted above, the actual language from the MOU is that: "The full range of progressive discipline is not always required for PSEs; however, the parties agree that an appropriate element of just cause is that discipline be corrective in nature, rather than punitive."

internal Union matter), but whether he was treated in a disparate manner because of his race. The Postal Service did not inform Plaintiff at the time of his termination (and does not explicitly argue here) that he was receiving "harsher discipline" because he was a PSE rather than a full-time MVO.  On the contrary, the record indicates that the Postal Service was treating the matter as progressive discipline: a discussion after the first accident, an LOW after the second and removal after the third.  But the issue is <u>why</u> he received this removal when McCloskey received only an LOW under similar circumstances.

Defendant also tries to suggest that the Union was responsible for McCloskey receiving more favorable treatment, but McCloskey did not receive a notice of removal which was reduced to an LOW during the grievance process (like Hipkiss).  Rather, he received the LOW from the Postal Service; the matter never reached the grievance process.  And as noted above, the record with respect to McCloskey indicates that, whatever advice the Postal Service received on this matter from the Union, it was clear that "the final decision on this matter is yours."  (ECF No. 48 Ex. 29 at USPS 119.)

Defendant cites no authority in support of the argument that two otherwise similarly situated employees can be further distinguished based on their positions within the Union or whether they are full-time or part-time employees.  Rather, as Judge Conti has observed, "[t]here is no requirement that two employees be disciplined under the identical policy to be found similarly situated."  <u>Mitchell</u>, 995 F. Supp. 2d at 432 (Mitchell was similarly situated to LK, a white paramedic who allegedly struck a patient and thus both engaged in terminable offenses, but LK was given only a suspension).

At this stage of the proceedings, Plaintiff must demonstrate that the Postal Service's articulated reason for his termination was a pretext for unlawful race discrimination.  He can

proceed along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). Or he can proceed along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. at 1111.

In the Mitchell case, Judge Conti held that the plaintiff satisfied his burden under Fuentes prong two by pointing to evidence that the defendant treated similarly situated persons not of the protected class more favorably. Specifically, she held that a reasonable fact finder could conclude that Mitchell (an African American paramedic accused of inappropriately touching a nurse) and LK (a white paramedic accused of striking a patient) were similarly situated and that Mitchell was terminated while LK received only a three-day suspension and this was sufficient. 995 F. Supp. 2d at 435. The same reasoning would apply in this case: Plaintiff is similarly situated to McCloskey but he was terminated while McCloskey received only an LOW.

Plaintiff also argues that he was subjected to discriminatory treatment because he refused to be called "black." As Defendant observes, this argument was never presented to any tribunal, including this one, before his deposition. Plaintiff did not raise it during the extensive EEO or grievance proceedings in multiple forums and he did not allege it in the Complaint or Amended Complaint filed in this Court. See ECF Nos. 1, 4-5, 10, 15-16; ECF No. 42 Exs. U, BB. Defendant indicates that no written discovery was requested regarding this issue, and none of his immediate supervisors (Bradshaw, Ramsey or Dziubinski) or second-level supervisor (Battle) were asked about it at their respective depositions. Thus, it is entirely undeveloped and will not be explored further herein. Nor has Plaintiff cited any authority (and this Court is aware of none)

that would support a race discrimination case based on such an argument.

Nevertheless, for the reasons explained above, Plaintiff has pointed to evidence from which the trier of fact could conclude that other, similarly situated non-members of his protected category were treated more favorably under similar circumstances. Therefore, with respect to Count I of the Complaint, the motion for summary judgment will be denied.

Count II: Hybrid Claim

In Count II, Plaintiff alleges that the Postal Service breached the CBA by imposing discipline that was punitive in nature rather than corrective and that his removal was not for "just cause." Defendant argues that he cannot maintain a hybrid claim because the Postal Service did not breach the CBA and the Union did not breach its duty of fair representation. Plaintiff responds that he has established a hybrid claim because the Postal Service breached the CBA by referring to his first accident when terminating him and because the Union breached its duty to him by withdrawing the grievance. Defendant replies that citing the first accident but not relying on it did not constitute a breach of the CBA and that the Union was not required to pursue what it concluded to be a meritless case.

Hybrid Claims

The Court of Appeals has explained that:

> Ordinarily, an employee files a claim against the union alleging breach of the duty of fair representation together with a claim against the employer alleging breach of the collective bargaining agreement in a "hybrid" section 301/duty of fair representation suit. In the "hybrid" suit, the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union, and vice versa. See United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 66-67, 101 S.Ct. 1559, 1565-66, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring in the judgment). Thus, the claims are "inextricably interdependent." Id.; see also DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983).

> Nonetheless, the claims are not inseparable. A plaintiff who has a viable "hybrid" claim against both the employer and the union may opt to bring only the section 301 claim against the employer or the breach of duty of fair representation claim against the union. See DelCostello, 462 U.S. at 165, 103 S.Ct. at 2291. Either claim standing alone can be brought in federal court because each has an independent jurisdictional basis. Id.

Felice v. Sever, 985 F.2d 1221, 1226 (3d Cir. 1993). A hybrid claim against the Postal Service under 39 U.S.C. § 1208(b) is identical to a hybrid claim under § 301 of the Labor Management Relations Act. Bowen v. U.S. Postal Serv., 459 U.S. 212, 232 n.2 (1983).

Defendant argues that Plaintiff cannot maintain a claim under either requirement of a hybrid claim: he has no evidence that the Union breached its duty of fair representation under these circumstances or that the Postal Service violated the terms of the CBA. Plaintiff disputes these contentions. Because Plaintiff cannot establish that the Union breached its duty of fair representation, the Court need not reach the issue of whether the Postal Service breached a provision of the CBA.

As the exclusive bargaining representative for its employees, the Union has a duty of fair representation. DelCostello, 462 U.S. at 164-65. However, "the union typically has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 567-68 (1990) (citing Vaca v. Sipes, 386 U.S. 171, 177 (1967)). "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190. The Supreme Court has further held that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991).

Defendant contends that the Union did not act irrationally when, having proceeded through two steps of a grievance and having received a detailed decision denying it, it decided to settle Plaintiff's grievance challenging his third at-fault accident in less than two years.[43] Jones testified that, on behalf of the Union, he concluded that it could not succeed in having the removal reduced after losing the case in two steps of the grievance process (Jones Dep. 28:10-24) and Plaintiff has not even suggested that this assessment of the situation was inaccurate, much less irrational.

Plaintiff argues that the Union did not consult him before settling the grievance, but Defendant has submitted testimony that it had no such duty. (Jones Dep. 40:6-13, 52:5-24.) Plaintiff points to no evidence to the contrary. Thus, as the Union was under no duty to consult with him prior to settling the case and because it did not act irrationally in doing so, it was not in breach of its duty of fair representation. Therefore, with respect to Count II, the motion for summary judgment will be granted.

An appropriate order follows.

---

[43] It is true that the Postal Service was not permitted to rely upon the first accident when disciplining Plaintiff pursuant to the CBA. However, the issue for purposes of this claim is whether the Union, which was aware of Plaintiff's history of accidents, acted irrationally in deciding not to pursue the grievance through the arbitration process.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALFONSO FREEMAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 15-1102 |
| | ) | |
| MEGAN J. BRENNAN, UNITED STATES | ) | Magistrate Judge Mitchell |
| POSTMASTER GENERAL, | ) | |
| Defendant. | ) | |

ORDER

AND NOW, this 27th day of March, 2017, for reasons explained in the

accompanying memorandum,

IT IS HEREBY ORDERED that the motion for summary judgment filed on

behalf of the Defendant (ECF No. 40) is granted with respect to Count II of the Amended

Complaint and denied with respect to Count I.


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge